2 being argued and 3 being submitted on the briefs. Two preliminary matters, however, first the court welcomes Judge Richard Stern, District Judge from the District of Massachusetts, sitting with us as a visitor. We appreciate his generosity in doing so and enjoy the chance to continue our association with visiting District Judges in each session. Secondly, we have admissions of two law clerks of our court. They are in the employ of my esteemed colleague, Judge Robert Mayer, and so he will be the move-in. We'll see if he can win his case. Judge Mayer. Thank you, Chief Judge Michel. I move the admissions of Damon Marcus Lewis, who is a member of the bar in good standing in the highest courts of Virginia and the District of Columbia, and Sherry Lynn Diener Shaw, who is a member of the bar in good standing in the highest courts of Maryland and the District of Columbia. I have knowledge of their credentials and I am satisfied, not only satisfied, I am certain that they possess the necessary qualifications. And since I've revaled upon them to stay with me for another year, the bar will have to wait another year to be enriched. The motion is granted and I just comment that probably no one better knows the qualifications of a young lawyer than the judge with whom they are working. So when Judge Mayer says he is certain, he has a very ample basis for making that assertion. The three cases being submitted on the briefs today without oral argument are Appeal 1047 from 2008, Hildebrand v. Steck Manufacturing, Appeal 3125 from 2008, Ramos v. United States Postal Service, and Appeal 7099 from 2008, Broome v. Department of Veterans Affairs. And with that, we'll complete the admissions business because I forgot the very important step of administering the oath. The motion has been granted but the oath is the operative act. So would you two please rise and face the clerk. Please raise your right hand. Do you swear or affirm that you will report yourselves as attorneys and counselors of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I do. Congratulations and welcome to the bar of the United States Court of Appeals. Now we'll call for argument in Appeal 1017 from the current year, Rothy Development v. Department of Defense. Mr. Barton, welcome back. Good morning to you. Please proceed. Good morning, gentlemen. I'm David Barton. I'm representing Rothy Development Corporation in this case. The law of this case is that government bears the burden of presenting enough evidence to move forward with its evidence to put a burden on Rothy to meet the ultimate burden of proving the statute in this case unconstitutional. I like the wording from western states which calls this government burden the burden of justification. The problem we have here is that there's no burden of justification for this statute based on the evidence that the government presents, keeping in mind that the Supreme Court has dispelled any thought that strict scrutiny is strict in theory but fatal in fact. The government has moved throughout this case with its wording and with its briefs to lead the court to think that strict scrutiny is somewhat less than strict scrutiny and the court has said again and again that strict is strict. I don't mean to interrupt but help me think through this. The government has a burden to come forward with what? Strong evidence? Some evidence? Strong evidence. And then at what point do we decide the evidence is strong enough with the burden I suppose shifts in some fashion? Well in this case you have to look at the evidence and see if, you have to look at the statute and see what the purpose of the statute is and then look at the evidence and see if Congress has seen adequate evidence to support the statute itself. Does adequate mean good evidence? The government needs a strong basis in evidence to support a race based program. A strong basis in evidence obviously is an issue that the court needs to decide. In fact, Rothy's position in this case is that there is no evidence to support this particular statute. The government and the court's primary heft of evidence in this case are six municipal disparity studies in six discrete locations in the United States. As we pointed out in our brief, these six studies fail to even preponderate on disparities among the groups first of all and within the groups in the industries. And without adequate disparities, and our argument is that disparities fail to preponderate even much less discrimination. In order to get to discrimination, there has to be something to support the disparities. That's required by Croson. Statistical evidence alone will not show it. In this case, even the statistical evidence doesn't show it because it fails to preponderate and that's pointed out. When you say fails to preponderate, what are you counting? We're counting both within the industries, whether there's discrimination across all industries. For example... Discrimination is the inference. The studies only measure disparities. Disparities across all industries. And disparities across all of the races. And what we have here, and this gets into what we would argue ultimately if we get to that point, is that part of the race-neutral problem is to identify under the over-inclusiveness and under-inclusiveness which races are entitled to what preferences in what industries they're working in. In this case, when I say preponderate, I mean less than 50% of the industries and the races showed disparities. If you can't get that high, you don't meet strict scrutiny. What I'm trying to get at is what authority do you base your version of preponderate on? Preponderate is a decision for the court. And we would regard, in this case... But is there some case that says the way to decide whether the evidence meets the strong basis in evidence standard is by doing the sort of counting you're doing using the verb preponderate? Is there some case that says that's the way to do it? Well, Crowson, of course... Or is it something you made up? No. Well, I haven't seen that particular term, or I don't recall seeing that particular term. I don't think I pulled it out of the air, so I think that I did pull it from one of the cases. The cases that I would pull it from are the line of cases of primarily Fullilove, Wygant, Crowson, and Adaran. Now, Fullilove and Wygant don't have application here because they don't fall into the strict scrutiny category the way Crowson and Adaran do. Crowson and Adaran both require the strong basis in evidence. If you can't even show by a level of 50% of the industries... And that gets to a whole other issue that you all, I'm sure, have read in our briefs of what industries are. In this case, the industries, they're using six studies in which the industries are different in all of those studies. Wouldn't it be more accurate to say they overlap as opposed to being totally separate and distinct? That's probably... Yes, I would agree with that. But the problem is when you're unable to identify the industries, and Crowson has, Crowson and Adaran both, have addressed the issue of having the industry, you have to be able to identify where the discrimination is. And if you don't have discrimination that is identified in a particular way, you can't tell what industries it's in. A strong basis in evidence would say that if you're going to reward all of the five presumed races in an equal manner, there should be a strong basis in evidence why that should be done. If you have different races who show disparities without even showing discrimination, these six studies don't show discrimination because they show no causal link between the disparities and the anecdotal evidence that there is there. So I think I followed it, but I could really go back because it decides the case for me. If we decide as a court that there was a lot of evidence before Congress from which an inference of discrimination could be drawn, is it our job to determine whether that was good evidence or is it the burden now on the pledge in this case to show that the evidence is bad? Who has to do this re-analysis? I'm not avoiding your question, but the issue in this case is that these studies were never even before Congress. Even the government admits that the six studies are not in the congressional record. They were never presented. There was never a hearing in order to reauthorize section 1207. Judge Rodriguez found, and it's stated clearly in his opinion, that these six studies are referenced in hearings. He didn't identify what hearings he was referring to, but he said they were referenced not only by Senator Kennedy and a few others in individual floor statements, but in hearings. Do you know anything about that? No, they were not. He's wrong. And the government admits that. They admit that they weren't discussed in hearings. There were no findings made as to these disparity studies. Interestingly, there were no findings made in any one of the six jurisdictions regarding the disparity studies as to what their purpose was, what they were supposed to do. For example, Virginia, rather than go to a race-based program based on their study, went to a race-neutral program. Let me ask you this. The defense authorization bill normally is the subject of hearings and a very extensive report. Did that not happen in the fall of 2005 and January of 2006 when this particular reauthorization was enacted? No, Your Honor. There was no hearing and no report either? No hearing and no report that had anything to do with 1207. That wasn't the question. There was a report on the authorization bill itself, right? Yes. You read it? No, I didn't read it all. I'm not aware of what hearings there were as to the authorization bill itself. I know that there was nothing in the hearings that pertained to 1207 because it can't be found. You looked? I looked. And the government doesn't seem to cite any report or hearing source of discussion about 1207? Correct. And in addition to that, there were no findings. Now, your argument that the six studies shouldn't be considered to be before Congress obviously doesn't have to do with the timing of the studies. They all were done and available and published prior to the reauthorization date in January of 2006. So they were before Congress in the sense of earlier than the congressional action. So your argument then seems to turn on the notion that if they're mentioned even specifically by a particular member in a floor statement, that doesn't count as being before Congress. So what is your definition of what action properly puts a document before Congress? I don't think that we need to get to that issue because in this case, the manner in which it could be before, there are a number of different things that could prevail upon that issue. And that is, was it before Congress in a hearing? Was it discussed in detail? Were findings made pursuant to these studies? All of those would suffice. So you draw the line between all of those on the one hand and Senator Kennedy making a statement on the floor on December 20th, for example, on the other hand. Yes. We have no evidence that Senator Kennedy even saw these. And it's very questionable whether he did because he made statements about these studies that he made in the U.S. DOT program, which is not at issue here. And he reached back to use language that he had used before this reauthorization of 1207 that relates to some... How does that prove he didn't know about these studies? I don't follow your argument. When you read his statements, you can get... I read the quoted portions. I didn't read the whole statement. I can get no indication that he's read these particular studies. And one of the reasons is that if he had read them and weighed them, he would have had before him the knowledge that Virginia didn't use theirs as a basis for a race-based program. He would have known that the Cincinnati study was found to be unconstitutional by, I believe it was a U.S. District Court, stretching a little bit. But anyway, a court found that statute to be unconstitutional. The writers of that opinion agreed that it was unconstitutional. And this court, the District Court, didn't even address that. They went into how the Cincinnati study... I don't know exactly what you're saying, but having much work in the Senate, well, there's a lot of opportunity to speak. You're asking, I think, more of Senator Kennedy than time generally allots. But you said rely on one case, the Hutton case, which I think is a 1980s case from the District of Columbia District Court. Do you have any other authority that says that we can't look to a floor assertion that these studies meant something to me? I think I had another citation in there. If not, I'll look while my opposition is speaking and see if I can find a reference. I had at least one other case. I didn't go exhaustively. I found cases that supported the fact that when you get into political rhetoric, and I think it's particularly apropos in this case where you're talking about the emotional field of race-based statutes and preferences, that you have to be particularly careful and that you go beyond what the government argues, that you don't have the rules of evidence as being applicable in this. But you also have to use your common sense and you have to use that whenever you're addressing the rules of evidence. And addressing that in this case, you cannot see that there was any weighing of these studies. But to go one step further, there were no findings as to why this statute was enacted. The only thing that is in the statements of Senator Kennedy and McKinney and Medendez are that they go through and they cite why they think 1207 should be redone with no findings as to why that is, but they end with the reason we need this program is because we need diversity in DOD contracting. And we all know that diversity is not the correct standard in procurement law. If findings is the issue, can you give me an example of a piece of congressional legislation, if one occurs to you, where you think here Congress did the right thing, here were adequate findings? I haven't had a case in the past where there were findings, but obviously in order to enact, in order for the court to evaluate whether the remedial purpose of this statute is correct, they're going to have to have some kind of findings. They don't have to say this is a finding, but their laws are replete with, the Congress is usually in the latter part of the statute, that Congress has found that certain things supported this particular statute. This case does not have that. And when you don't have those findings, you can't determine what their remedial purpose is or what the purpose of the statute is, other than the fact that they said the purpose of this statute's reauthorization in 2006 was diversity. They don't discuss in there that we're trying to rid ourselves of disparities in DOD, and this program could not do that because it's only based on what we would argue are inadequate facts within six jurisdictions around the United States. I think I've pointed out in our brief. Let's hear from the government now, and then we'll let you have back the two minutes that you sought to reserve for rebuttal. Okay. Mr. Stevens? If letting such a large number of contracts every year through the Defense Department programs is viewed as supporting actors in the contracting markets who are discriminating racially, that's a pretty broad basis. And in that context, other than if the contracting exactly mirrored the proportionality of the different racial groups, how would we ever know when the program is over? Well, I think one way that there's two mechanisms that come to mind about how a program might be over. First of all, one of the features of this program is that if the goal is met for contracting, the price evaluation adjustment... No, no, but I'm trying to understand what passive participation in a system that historically is viewed as discriminatory really means going forward. How will we ever know that the discriminatory after effects have been wrung out of the system so that a racial preference would no longer be justified? Other than if the particular racial group got exactly the same percentage of the contract as it makes up of the total number of contractors. I don't think you would need that kind of result for all of the groups in order to conclude that the lingering effects of discrimination had faded away and ended. You would look, again, Congress in trying to enact a program like this would have to come up with a strong basis in evidence. In looking at the experience, the evidence that you had here, we had hearings before the Small Business Committee, four hearings. We had these six disparity studies. We had statements from members of Congress about their districts. Wouldn't you need to prove that there is no discrimination by anybody, public or private, federal, state, or local, anywhere in the United States against any racial group in any kind of industrial sector? You'd have to prove the absence of any discrimination anywhere, it seems to me, before you could conclude that the government would no longer be passively participating in financially supporting a corrupt system. I think as long as there was significant discrimination in those private and local markets, yes, we would argue that for DOD in particular that spends such a large amount of money across the country in those markets, it's likely their spending would continue to perpetuate it. But if the evidence about those state and local contracting markets indicated that there was not any longer significant disparities, it wouldn't have to prove that each group received a proportionate amount that it made up. What's the difference? You're saying no disparity seems to me to be just a different way of saying proportional award of contracts. I don't think that these studies assume that you had to have completely proportional representation in order to, again, as in other statistical analysis, they look at the numbers and if the disparities are statistically significant, if they are large enough that they're unlikely to be caused by chance or random information, then they would not be deemed statistically significant and that could happen before things were in lockstep. There might be areas of the country where things improved more rapidly than other areas of the country. And again, if it was a very, if surveying the body of evidence that was before Congress, it appeared that you only had a very localized problem, perhaps then a nationwide program. What does the total picture look like? Here you have six municipalities. My recollection is that there's something like 146 standard metropolitan areas, larger cities in the United States. So if the denominator is 146 and the ones showing some kind of disparities are only five, five out of 146, that's nowhere near half or even a quarter or even a tenth. So aren't we having to make assumptions about what's going on in other jurisdictions to justify a nationwide program using a racial preference? I think Congress is making assumptions about what's going on nationwide and I think Congress as a national legislature is entitled to do that. Could they do it based on just one? I don't think if we only had one and it was only one city and we were required, again, it would be very hard to meet the burden of Congress's inevitability. Why is five cities suffice if one would? Well, it's not just five cities, Your Honor. It's the state of Virginia, it's a county in California, Alameda County, which is the county surrounding the East Bay area around Oakland. It's Cuyahoga County in Ohio, which is Cleveland and the surrounding jurisdictions. It's New York City, which is just a city, but it's a very large. So whether you want to talk about how many states out of the 50 states or how many counties out of the 3,000 or 4,000 counties or how many large cities out of the 146 large cities, it has to be more than minimal, it seems to me, or it's not meaningful. One or two won't do it. One or two states, one or two counties, one or two cities won't do it. In this case, I think they are sufficient because they're large jurisdictions and states, several of them, they're spread around different regions of the country. The findings here were consistent with each other and were consistent with findings that had been done earlier. There are statements by other members of Congress that, again, we didn't have the actual text of the studies that was submitted in the record, but there was Representative Watt from North Carolina mentioned the results of a study that was conducted in his state in North Carolina. He was talking about highway contracting, wasn't he? I'm sorry, what's that? Wasn't he referring to highway contracting? He was talking about, yes, but a lot of that is still... It's my problem, again, to follow up on Chief Judge Michelle's question. My problem is that these studies, assuming they were before Congress, assuming that they are valid, might tell me something about how municipalities go about letting out politically driven contracts. How do I get from there to the Department of Defense discriminating broadly in the type of contract that was issued in this case? I'm not sure what you meant by politically motivated, but... I'm assuming that in a lot of highway contracts there may be a little more politics than there might necessarily be. Well, these studies didn't just look at highway kinds of factoring. The studies looked at sort of four broad industries, construction, architectural and engineering studies, goods, and also professional services. I don't think that all of these studies can be characterized as just looking at the types of contractors who are paving roads and driving those out to the extent that a lot of the contracting was done by different authorities. Department of Transportation, that might be true. Again, I'm thinking now here. For instance, I don't think the New York City study was limited to transportation contracts. I don't think the state of Virginia. I think they looked at broader categories and broader areas of their own contracting. I don't think that's a problem when you look at these studies. Did you agree that the Defense Department in selecting prime contractors did not discriminate based on race? I think I would agree that there was not evidence of direct, intentional, sort of specific discrimination by a DOD employee against a prime contractor. The studies that the district court looked at here and the other statements mostly relied on experience in, well, the studies themselves did not look at DOD. I think there were two of the hearings. I'm not talking about DOD. I'm not talking about the municipality. So DOD didn't ever discriminate in its selection of its prime contractors. I wouldn't say that. I don't think there were statistical studies that were submitted that analyzed DOD's own prime contractors. Isn't it the case that there's no evidence? There were witnesses who said there was no known instance of discrimination. There was one deposition where someone said that. But two of the hearings that the district court cited specifically looked at Pentagon procurement and DOD procurement and small businesses and small minority businesses. And while they did not have the detailed sort of longitudinal statistical studies here, there was testimony by business owners, by bankers, by other people about problems that minority business enterprises experienced in federal procurement as well. And so there was that kind of evidence about problems with DOD itself. I thought the government admitted that DOD was not thought to have discriminated in its selection of prime contractors. So then the question would be, well, did those selected prime contractors then turn around and discriminate on a racial basis in the subcontracts? And as far as I could tell from all the briefs and the opinion below, there was no evidence of discrimination by the Defense Department's prime contractors. And if that's right, then there's no discrimination anywhere at any level in the system of defense contracts. Well, no, I think that Croson did hold that the Congress has a compelling interest in preventing federal dollars from reinforcing state and local and private discrimination. Well, it said that. It didn't hold that because it struck down the program. It didn't uphold the program. But it didn't strike it down on that basis. It struck it down on the basis of the particular studies that were before it about Richmond and said that it hadn't done an appropriate comparison that would allow you to infer that kind of private discrimination. Isn't it true that your case rests primarily, if not exclusively, on the idea of passive participation in supporting a discriminatory situation? Yes, the statistical evidence and a great deal of the other testimony and other hearing is about state and local contracting. And the compelling interest that the district court found was that the DOD, Congress was entitled to act to prevent DOD from reinforcing and using its dollars to perpetuate that discrimination. What do you mean reinforce and perpetuate? If DOD itself is not discriminating at the prime contractor or subcontractor level, then how can you say DOD is perpetuating discrimination? Well, when DOD lets a contract, say in the construction industry, if there's been lending discrimination that has prevented businesses owned by Asian Americans or African Americans from getting funds to start up their businesses, there will be fewer of those businesses there. When DOD, if the state and local contractors, again, in terms of building up experience, if they're discriminating against minority-owned businesses, they're not getting contracts, they don't have the experience ratings. When DOD comes in and decides that they're going to hire a contractor in these industries and if they look at them just across the board, there won't be as many minority business enterprises as there would have been without discrimination. I don't understand how that yields the conclusion that DOD is perpetuating, DOD is reinforcing discrimination by other people. If DOD lets its contracts in a way that just looks at the capitalization of these firms and says, could you come up tomorrow? I don't know if this is a precise contract, but if they said, do you have $5 million that you could put up in a bond tomorrow? If three majority-owned contractors went out and got lenders to give them that kind of line of credit and they say, yes, we can do that, and the lenders discriminate against minority-owned business and said, no, we're not going to give you credit, then when DOD looks at this market, they would not give that minority-owned business a loan. They would say, no, you're not qualified. Here are three people who can do the job. Let's look at these three in that sense. If that's the problem, how can this program be narrowly tailored to solve it? You're describing something to me that's entirely different than the problem that Congress purportedly is addressing. Well, I think it's trying to look at those are sort of present effects of discrimination, or those are things that there's lingering effects of that kind of discrimination that still affect the number of minority business enterprises and their capitalization and their ability to go forward. And what Congress did here was say that we want to set a goal and try to alleviate, I guess, or help in some way, take into account those lingering effects by, again, setting up these various mechanisms, and there were a variety of them, to improve the odds of some minority business enterprises getting these contracts. The program is also targeted, though, and I think Congress tried to take these kinds of concerns into consideration. It directed the Department of Commerce to do a study and to designate the industry groups and the regions of the country where there really were these kinds of significant statistical disparities and said that Commerce is going to designate where and what industries and what regions of the country these kinds of mechanisms are going to be used, and if there's a region where there isn't. But the reauthorization at issue in this appeal isn't justified by any Commerce study because the judge said it was too stale, so he didn't rely on it. So it's not relevant to the defense of this program for the current reauthorization in 2006. I think it's relevant in the sense that this is a facial challenge, Your Honor, and so the regulations, the statute and the regulations themselves, require Commerce to do this kind of study and limit the use of these mechanisms to industries that are designated by Commerce. Now, if Commerce hasn't updated that study recently enough, or if... Why isn't it? Well, the price evaluation adjustment has been suspended since 1999 because that was another feature of the program. Why didn't Commerce update their study from the 90s? Isn't that what Commerce wanted them to do? Well, that's a different... that was for two different purposes. The statute that asked Commerce to make designations now, that study is done for the purpose of targeting the price evaluation adjustment and the other procurement mechanisms. The first study that was done had been relied on in earlier reauthorizations because it had a lot of good information in it to justify the reauthorization, but the district court, as you noted here, concluded the particular studies that that first study looked at were too outdated, it felt, to serve as a basis for the 2006 authorization here. The points you emphasize, such as loans and bonding and so forth, seem to go to market entry by minority-owned firms, difficulty of getting into the business at all and difficulty of strengthening your operations in order to have a better chance of getting more and larger contracts. But as far as I could tell from the record, there's some anecdotal statements about those kind of market entry type barriers, but no studies, no statistics at all. Isn't that right? There was not a study in this record that specifically looked at, I don't know, different, say, loan rate grants or things like that. You're right. But I think there were, in the hearings especially, there was testimony from bankers, from business owners, and from other state officials, procurement officers that were directly involved in this that talked about difficulties. There was a whole hearing on the availability of capital for minority businesses and talked about these things. There were also testimony and other statements about more present effects of discrimination in bidders who did not... What I'm trying to distinguish between is evidence that had a strong basis in statistics and studies versus evidence that was sort of opinion statements of individual witnesses or what Debris referred to as anecdotal evidence. Yes, I think you're right about that. As far as I can recall, the market entry or growth and advancement type problems were supported only by anecdotal evidence and not by any studies. They were not supported, right. There were not detailed studies as in these six local studies here. But I think we would also emphasize that these findings and this testimony is also consistent with the great body of evidence that had been put forward in the earlier reauthorizations and in earlier hearings. And while we can't rely on that evidence as a sole basis for our strong basis in evidence because it was found by the district court to be stale, I think it does go towards sort of the reliability of this kind of testimony and this kind of evidence because it's in keeping with both the findings of disparities. It's a permissible inference from the finding of the disparities in the state and local studies, and it's consistent with much of the evidence that came before in the earlier reauthorizations. In the case of a jury or a bench trial, a court of appeals will frequently disapprove inferences from evidence if they're deemed to be extreme, excessive. Usually we talk about unreasonable inference. Do we have the same authority and duty where we're reviewing inferences apparently implicitly drawn by the Congress? I would suggest that Congress in its legislative function deserves a greater degree of deference than you would give to a jury in the same bank. Does that mean Congress is permitted constitutionally to make unreasonably broad inferences? I think when a plaintiff challenges a statute, once Congress has presented, has evidence before it, and those studies and the other evidence allows the inference of discrimination, I think Congress was entitled to draw that inference and to take action as it deemed fit. I think a plaintiff has the opportunity then to come in and challenge that evidence, but they need to present their own expert evidence, competent evidence that will raise a genuine issue of material fact on summary judgment. In this case, there's no problem about evidence. Nobody says there needs to be a trial. Nobody says there's the typical conflict of testimony or other evidence that requires a trial in front of a fact finder like a jury. Both sides asked for summary judgment. One side got it, the other side didn't. In their brief, the relief they asked for is summary judgment in their favor. You got it in your favor at the district court, and they're asking for us to rule in their favor. We're not talking about whether they put in enough evidence to get a trial. They don't want a trial. They aren't asking for a trial. They have no burden to put in any kind of evidence. The question is whether the government's evidence justifies the program under Croson and Adderam. We would submit that it does, Your Honor, and that Congress had enough evidence before it, the statistical evidence, the four hearings, the statements of the members that referenced other kinds of information, the reports that came from the Small Business Administration and the United States Civil Rights Commission that this body of evidence together, and the studies themselves also included testimony and descriptive evidence, that this was sufficient for Congress to enact the statute here and that it fashioned the program in a way that it was narrowly tailored to the inferences of discrimination. Isn't it the case that the program covers every state, every city, every county, every market, every industry? It's an absolutely blanket program. The program is authorized throughout the country, but again, the regulations require that these kinds of price adjustment mechanisms can only be used when the Department of Commerce does a study and designates specifically. These are the right now, I think in 1999, Department of Commerce designated approximately 50 industry groups, the three construction industry groups that it designated. Many of them were limited to certain, maybe only 10 states or 15 states or 20 states, and so I think what Congress was saying is this is a nationwide program. There's still evidence here that this is a problem. It's a problem throughout the country, but I think they understood the direction of the Supreme Court and this court and other courts and said we can't stop there. We need to fashion a program. But there are exclusions. Certain states are excluded. Certain states are excluded and certain industry groups are excluded, and the Commerce study is also supposed to determine what percentage adjustments, say in the example of the price evaluation adjustment. How often does Commerce produce this study? The regulations call for it to produce it every three years, again, because the statute also says that if DOD and the other agencies meet their goal, the regulations are suspended. Commerce hasn't updated the study since it's been suspended every year since 1999. There has been no price evaluation adjustment. in operation on DOD contracts since 1999, and so I think, again, while the program is authorized around the country, Congress really tried to be careful and put in protections to make sure that you didn't treat every industry and every business around the country the same with the same assumptions. They tried to target. And that goes to the narrow tailoring idea, right? That definitely goes to the narrow tailoring idea. But it doesn't go to whether there's a strong basis in evidence to justify the program based on racial classifications to begin with. I think it's something that you can consider. I think when you look at the program that Congress authorized on its face, it authorized a program that explicitly requires findings of disparities by Commerce in different industries around the country before these mechanisms are put into effect. Congress didn't just say, DOD, go out and use these mechanisms in every contract you do. They said this is something that can be used when Commerce finds there is discrimination in certain industries and certain areas. If I could go back to it again. Your view, then, is that in this case, looking back at this case, that the burden on the government was to come forward with a lot of evidence. Yes. The burden that's on the plaintiff to prove it isn't very good evidence. Yes. Okay. All right. Thank you, Mr. Gordon. Thank you. Two minutes. I'll mention only one or two. Let me ask you a question, Mr. Barton. This case was here before. The opinion was written by this court and told the district judge what he should do on remand. What is the main thing he didn't do in complying with the opinion of the owner of this court last time? He's unable to define. I've got 13 different points here, I think. But probably the main one is he failed to define the scope of injury and the extent of the remedy necessary to cure its effects. And the problem that is created by that is that he shows no causal link. There's no way to establish a causal link to the supposed alleged discrimination that he wrongfully inferred from the disparities in this case in the six studies in scattered jurisdictions and unjustifiably linked those businesses to anything that DOD did or could do. And there'd be no way to measure over the long term whether whatever remedial effects Congress hoped for, they got to. I think Judge Mayer, that's a very important question. If the district judge didn't comply with the instructions of this court, that would be a pretty serious, important thing for us to focus on. But I didn't quite understand your answer. What precisely did we order him to do that he didn't do? Specific directions on compelling interest would be to, let's see. When you say you have 13, just give us the strongest so we can get some sense of to what extent did he not do what we ordered him to do? He did what you ordered him to do, but it doesn't meet constitutional scrutiny. He thinks that he defined the scope of injury with the six statements Well, if you think he committed a reversible error, that's one thing. If you say he didn't comply with this court's order, that's something else. I understood Judge Mayer's question to have to do with compliance. And I thought your answer was no, he didn't comply, but now you seem to say, well, he complied, but he did it so badly it isn't affirmable. That's probably closer to correct, yes. The primary point, and you all got to it in your questions of counsel, were why should this be overturned? And Adaran says, unless Congress clearly articulates the need and basis for a racial classification, in this case the only thing Congress has articulated is diversity, and also tailors the classification to its justification, the court should not uphold this kind of statute. Counsel is wrong in that neither this statute nor anything that the Department of Commerce has done addresses disparities or discrimination in any state. The program was never intended to do that. The language in this statute is the same as it was in the statute in 1999, and the department regarding what the Department of Commerce is supposed to do to identify where there might be disparities, in other words, a disparity study. So the emphasis in your statement is on articulates. You think the law requires Congress to articulate the extent of the discrimination and then match the remedy to its articulated metric of discrimination. Absolutely. And so the failure here is that, in your view, is that when Senator Kennedy cites the six studies, he doesn't articulate anything other than there's a lack of diversity. Yes. And you think that doesn't meet the requirement of articulating the extent and location and nature of discrimination. That in addition to numerous other things, but it does not, correct. In one of your questions, counsel's response was she thinks Congress was making an assumption about disparities, but we don't know because there aren't any findings. We don't know what it was. To stand here and only be able to argue that there is a thought that maybe this is what Congress is doing is what makes it impossible to justify this statute. There's just no basis for it. She referred to Watt and Medendez referring to three other disparity studies, and that spiked in my mind my thought throughout this whole case. We don't even know that the disparity studies that are in the joint appendix here are the ones that Senator Kennedy or anybody else in Congress could have seen. We don't know if these are final copies, whether the ones Congress saw were draft copies. We don't even know if they're the same ones. He didn't articulate anything from those six studies that gives any indication that these studies are even the ones he's referring to now. He referred to them by title and author and city, so it's conceivable that what he or his staff read was a draft or a summary or something, but I don't think that there's any serious question about which six studies he was referring to because his description was quite detailed. And I won't contest that. I'm just saying that in order to have a strong basis in evidence, you ought to know whether it was a draft copy that was possibly changed significantly between the draft and the final copy. We don't know whether this copy that we have in the record is a draft copy because defendants don't know what those were because they aren't in the congressional record. But the real issue is that you have six studies and you all dealt with that, but one of the facts of background in this case is the Urban Institute study, which had 59 studies, and we've cited specifically... Isn't that one of the studies that Judge Rodriguez disallowed on the remand proceedings? Yes, and I'm not using it for any other purpose than the one that I'm bringing up right now, and that is by line and verse, that conglomeration of disparity studies did not find that these 59 studies showed discrimination in those 59 areas, but the biggest thing is they made clear and they said, we want to make clear that these 59 studies are not of a wide enough scope to give any idea that the disparities in these 59 areas show a nationwide standard of disparity. Well, of 59 of those that are analyzed by one of the big think tanks in the city, certainly six is not going to show you anything that Congress can address. We've given you a lot of extra time, and I think we have your case clearly in mind, so we'll leave it at that. We thank both counsel and take the appeal under advisement. Thank you.